# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 38858**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Sean M. OLIVER**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 January 2017

———————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Dishonorable discharge, confinement for life with eligibility for parole, and reduction to E-1. Sentence adjudged 30 January 2015 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Isaac C. Kennen, USAF and Brian L. Mizer, Esquire.

*For Appellee:* Major Jeremy D. Gehman, USAF; Major J. Ronald Steelman III, USAF; Captain Tyler B. Musselman, USAF; and Gerald R. Bruce, Esquire.

Before DUBRISKE, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge HARDING delivered the opinion of the Court, in which Senior Judge DUBRISKE and Judge C. BROWN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

HARDING, Judge:

Officer and enlisted members sitting as a general court-martial convicted Appellant, contrary to his pleas, of making false official statements, murder with intent to kill, assault consummated by a battery, and obstruction of justice in violation of Articles 107, 118, 128, and 134, UCMJ, 10 U.S.C. §§ 907, 918, 928, 934. He was found not guilty of the greater offenses of premeditated murder and aggravated assault. The adjudged and approved sentence was a dishonorable discharge, confinement for life with eligibility for parole, and reduction to the grade of E-1.

Appellant raises eight assignments of error: (1) the military judge erred in concluding that Appellant's oral and written statements to the Air Force Office of Special Investigations (AFOSI) were voluntary; (2) Appellant's Fifth Amendment[1] right to counsel was violated; (3) Appellant's Sixth Amendment[2] right to counsel was violated; (4) Specifications 1 and 2 of Charge I are multiplicious and an unreasonable multiplication of charges; (5) the military judge erred when he failed to give a "leniency" instruction regarding a witness's testimony; (6) the military judge erred when he failed to give a defense of accident instruction; (7) trial counsel committed prosecutorial misconduct during findings argument; and (8) seven minutes of missing trial transcript of discussion of findings instructions is a substantial omission requiring a new trial. We find no prejudicial error and affirm.

## I. BACKGROUND

In the early morning of hours of 14 December 2013, Appellant was pulled over by the German police just outside of Kaiserslautern, Germany, near the Vogelweh military installation. While one officer advised Appellant of the reason for the stop and examined Appellant's identification, his fellow officer noticed a passenger seated awkwardly and motionless in Appellant's vehicle. When asked about the condition of his passenger, Appellant replied that his passenger was merely passed out. Upon closer examination, the police determined that the passenger, Petty Officer Second Class (PO2) DC, was not breathing. The officers, with Appellant's assistance, quickly removed PO2 DC from the vehicle and attempted to revive him. PO2 DC was unresponsive and soon pronounced dead. An autopsy conducted by the German authorities that same day concluded that PO2 DC had died from manual strangulation. The

---

[1] U.S. CONST. amend V.

[2] U.S. CONST. amend VI.

German police immediately arrested Appellant and placed him in a German confinement facility.

The night before, PO2 DC had joined Appellant and Specialist (SPC) CK at the apartment of Staff Sergeant (SSgt) TS in downtown Kaiserslautern, Germany. All four were assigned to the American Forces Network (AFN) Europe and had gathered for the purposes of a "guys' night out" at a bar in Kaiserslautern. Additionally, Appellant intended to talk to PO2 DC about the state of his marriage. PO2 DC and his spouse were discussing divorce and Appellant, with the full knowledge of PO2 DC, had befriended and engaged in a sexual relationship with PO2 DC's spouse. After consuming one or two drinks each at SSgt TS's apartment, the group walked approximately 15 minutes from the residence to the bar. During the walk to the bar, Appellant and PO2 DC discussed PO2 DC's spouse. Once at the bar, all four servicemembers became intoxicated. While there, another co-worker, SSgt SP, joined the group for the evening. Hours later—early into the next morning—all five servicemembers departed the bar and walked back to SSgt TS's downtown apartment. At some point while out at the bar and prior to returning to the apartment, SPC CK confronted PO2 DC about a racial slur PO2 DC had made about another AFN co-worker at a Thanksgiving gathering. Once back at the apartment, the confrontation between SPC CK and PO2 DC continued, and Appellant intervened. The witnesses at trial, to include Appellant, offered differing versions of what happened next, but at some point PO2 DC was lifeless on the floor and bleeding from his ear.

During his oral interview with AFOSI and later in his written statement, Appellant claimed that he was breaking up the fight between SPC CK and PO2 DC and inadvertently pushed PO2 DC causing him to fall to the ground possibly hitting his head on a kitchen counter. During his testimony at trial, Appellant revised his version of events claiming for the first time that SPC CK struck PO2 DC on the head with a glass whiskey bottle. In both versions, Appellant claims that he moved PO2 DC to the bathroom unconscious but still alive. Appellant claims he then left SSgt TS's apartment to go to his home. Concerned that PO2 DC might wake up disoriented and belligerent, Appellant returned to SSgt TS's apartment to revive PO2 DC and to take him home. Appellant claimed that once revived, PO2 DC became angry with him and struck Appellant. Appellant responded by placing PO2 DC in a chokehold. Appellant testified that he released the chokehold once PO2 DC became unconscious and that he did not intend to kill PO2 DC. Appellant maintained that PO2 DC was still alive at this point. The other witnesses, SPC CK and SSgt SP, testified that Appellant and PO2 DC were alone in the kitchen when they overheard a fight. SPC CK testified that shortly after the fight in the kitchen, Appellant told him that PO2 DC was dead. SSgt SP testified that he overheard Appellant tell SPC CK that PO2 DC was dead.

At trial, Appellant described how he got PO2 DC's body into his car and admitted that his intent was to dump PO2 DC's body in a remote area outside of Kaiserslautern. Appellant was on his way to do so when he was pulled over by the German police. Appellant spent approximately three days in a German confinement facility prior to being released to United States military authorities. While in the German confinement facility, Appellant was interviewed and gave a statement to German investigators, had a German attorney appointed to represent him, and appeared at a preliminary hearing. Upon release, Appellant was permitted to stay at his own residence and work his normal duty schedule prior to being taken to AFOSI for an interview on 20 December 2013.

## II. DISCUSSION

### A. Voluntariness of Appellant's Confession.

Appellant asserts that on multiple occasions during his interrogation, agents employed tactics that resulted in an unlawfully induced confession and that the confession was involuntary under the totality of the circumstances. The military judge found that "the agent's interrogation tactics, although problematic in several instances, were not inherently coercive overall and did not overcome the accused's will to resist." The military judge found that both the accused's oral and written statements were voluntary. We agree.

"A military judge's denial of a motion to suppress a confession is reviewed for an abuse of discretion." *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *United States v. Pipkin,* 58 M.J. 358, 360 (C.A.A.F. 2003)). The military judge's findings of fact are upheld unless they are clearly erroneous or unsupported by the record; however, we review de novo any conclusions of law in a denial of a motion to suppress a confession. *Id.* "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis,* 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

When analyzing the voluntariness of Appellant's statements to investigators, we review the totality of the circumstances to determine whether his "will was overborne and his capacity for self-determination was critically impaired." *Chatfield,* 67 M.J. at 439 (quoting *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996)) (internal quotation marks omitted). We evaluate "both the characteristics of the accused and the details of the interrogation." *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)) (internal quo-

tation marks omitted). We consider an appellant's "age, education, experience, and intelligence as part of the circumstances bearing on the question whether a statement was voluntary." *Id.* at 439–40 (citing *United States v. Freeman*, 65 M.J. 451, 454 (C.A.A.F. 2008)).

In this case, the military judge made detailed findings of fact regarding Appellant's characteristics and concluded that the "accused who was a 34 year old NCO clearly understood his rights and knowingly waived those rights at the outset of the interview." The military judge further detailed Appellant's education, prior experience with law enforcement, family history, and self-reported mental health history. Regarding the interview, the military judge found that "at no time . . . did the accused give any indication that he was ill or tired, and he appeared to be coherent, able to interact, oriented as to time and place, acknowledged questions, and provided contextually appropriate responses." Overall, Appellant's characteristics weigh in favor of his statement being voluntary.

Turning to the interrogation itself, Appellant points to three statements by the interviewing agents, arguing each was an unlawful inducement that could serve as the basis for suppression of the confession that followed. These statements are:

- "When [commanders] see [their airmen] are truthful, especially when you have a female commander, they tend to go into mommy mode, and they try to protect them."

- "You're not going to incriminate yourself in this. There is no way you can incriminate yourself."

- "After this, after you tell us the truth, okay, we're going to call your first shirt and you are going home. That's the end of it."

We will briefly address each in turn, but first we must provide the context of each statement within the overall interrogation. As the military judge noted in his written ruling, the initial 30 minutes of the interrogation consisted of rapport-building prior to advisement of Appellant's Article 31(b), UCMJ, 10 U.S.C. § 831(b) rights. When asked whether he wanted a lawyer, Appellant replied "not right now." When asked whether he was willing to answer questions, he answered "yes." Appellant does not challenge the validity of the initial waiver of his rights. Following the waiver of Appellant's rights to counsel and silence, an approximately three-hour discussion ensued. During this discussion, Appellant freely shared his initial version of events with minimal questioning by the agents. Appellant claimed that he had gone out searching for PO2 DC and found him in a "zombie-like" state walking the streets of Kaiserslautern carrying a bathmat and towel. This was followed by a 30-minute break where Appellant was left alone.

When the agents returned from the break, they began to challenge elements of Appellant's story and his claims of lack of recollection as to key details. Appellant stated earlier that he had not noticed any injuries on the deceased. One of the agents asked whether Appellant would be shocked if the decedent had a large cut on him. Appellant denied any knowledge of a cut. The agents next informed Appellant that there was blood all over SSgt TS's apartment. Appellant stated that he had "no idea" how the blood got there. The agents then told Appellant that his story was "slightly off" and that they believed the "whole situation happened from one giant accident." Appellant maintained his lack of knowledge of any cut or blood.

The agents then informed Appellant that video from the bar indicated an altercation had happened there. Appellant then, for the first time during the interview, began to acknowledge the possibility that "I did something and I don't remember it, and now I have some invented memory about the events of that night." The agents raised the manner of death as being "choked out" and asked Appellant for a response to that. Appellant replied: "I would say that I'm really afraid of myself right now." The agents continued to frame questions and statements in terms of an accident that had happened. Appellant raised the possibility of the deceased's injury to his throat being caused or compounded by Appellant placing him in the car. Appellant quickly acknowledged that the presence of blood at the apartment and lack of blood in the car made that scenario unlikely.

The agents then asked a series of questions concerning Appellant's story about where and how he found the deceased. The agents continued to press Appellant for details and made the first statement that Appellant claims was an unlawful inducement.

> Appellant: Well I am afraid something bad is going to happen to me. I -- I -- I --
>
> SA DH: Well, you need to get past that here, and you need to tell us exactly what happened. Like we told you before, the way it works out is -- so we're going to do the report, all right, and we present it to the authorities, all right, the action authorities. So your commander is going to read it. She's going to figure out what she wants to do with it. If she sees that you've been lying the entire time or less than truthful, 99 percent of the time commanders get irritated that their troops were not truthful whether it was something big or something small, so they try to hammer them. *When they see they are truthful, especially when you have a female commander, they tend to go instinct and into mommy mode, and they try to protect them.*

Appellant marshals this and other similar statements made by the agents as an impermissible promise of false leniency. The substance conveyed to Appellant, however, was only that lying is typically viewed as an aggravating factor and that being truthful was generally a mitigating factor regarding a disposition or punishment decision by a commander. There was no express promise of leniency. Further, this appeal, focusing on how his commander would view him, had no immediate impact on Appellant as he steadfastly maintained his lack of memory.

At this point, the agents directly told Appellant, "Dude, I'm not buying it, brother." They specifically confronted him about the implausibility of the "zombie" story and, while Appellant agreed that the story sounded ridiculous, he did not abandon it at this time.

The agents continued to challenge Appellant's claimed lack of memory by pointing out that the forensic testing would show what happened and how Appellant's story implicated his friends. Still maintaining his lack of memory, Appellant relayed that he was afraid what was going to happen to him. He then acknowledged a perfect understanding of his commander's limited role in determining his case. "Even if my commander wants to be lenient, I mean, it's not my commander's call." Appellant's statement relates back to the prior discussion about his commander and rebuts any notion that Appellant was induced to confess by reliance on a shield of protection or leniency provided by his commander.

The agents next suggested that Appellant should worry about what other people were going to think of him to include what his kids would think by presenting an accidental death contrasted with a "vicious murderer." Appellant still maintained his initial version. The agents then asked whether the deceased's wife was involved or if Appellant "masterminded" it all by himself. Appellant denied that she was involved and told the agents that they were being ridiculous to suggest "masterminding." The agents told Appellant they were irritated with him and that they knew he was lying. Appellant then abruptly asked: "Was the cut on his ear?" The agents followed up on what Appellant meant by that and asked where the cut came from. Appellant then responded by asking whether this would end up in the military newspaper. The agents told Appellant to focus on the ear. The precise exchange went as follows:

> SA DH: -- if you keep going back and forth on this, you're going to wind up making this all fuzzy again on yourself instead of trying to recollect what you just remembered now, so focus on –
>
> Appellant: No, I'm focusing on like my fear of incriminating myself in this and I'm debating on whether or not I should.

> SA DH: *You're not going to incriminate yourself in this. There's no way you can incriminate yourself in this.* The fact is you either did it or you didn't do it, and we're trying to give you the benefit of the doubt to figure out exactly how that happened.
>
> Appellant: If my memory is that --
>
> SA DH: The memory, like I said before, is a fabricated memory and we need to get to the bottom of it. You yourself said that you fabricated this memory. And now you're starting to identify that he had a cut on his ear.

The agents once again confronted Appellant with the incredible nature of the "zombie" story and continued to try to reorient Appellant to describe the cut on the ear. The following exchange ensued:

> Appellant: And now I'm really f---ing scared, because if I tell you --
>
> SA DH: Scared of what?
>
> Appellant: Because if I tell you these things, if I tell you what I remember.
>
> SA DH: Do you understand what's going to happen to you after this?
>
> Appellant: No, I don't.
>
> SA DH: *After this, after you tell us the truth, okay, we're going to call your first shirt and you are going home. That's the end of it. That's it. We're not going to throw you in a German jail or anything else like that.*
>
> Appellant: No, but --
>
> SA DH: We're not taking away your rights or anything, but we're just trying to give you the opportunity to tell the truth. Whether you tell us exactly what happened or not, the investigation is going to show exactly what happened, so whether you continue with this fabricated lie or anything else.

The military judge found that the agent's statement that Appellant could not incriminate himself was clearly improper and erroneous. It was. The statement was completely at odds with the express advisement required by Article 31(b), UCMJ, 10 U.S.C. § 831(b), that any statement made by a person accused or suspected of a crime may be used as evidence against him. Whether this statement by the agents rendered any subsequent statements made by Appellant involuntary depends on whether Appellant was in fact induced by it or otherwise relied on it in deciding to change his initial version

of what happened. The military judge considered the impact of the agent's statement in the totality of the circumstances in assessing whether the accused's statements were voluntary and also analyzed whether the agent's statement provided a basis to find de facto immunity.

Important to the military judge's analysis was that shortly after the exchanges above and prior to Appellant admitting to placing PO2 DC in a chokehold, Appellant requested and was granted a 10 minute break. Even more critical was the discussion after the break wherein the potential maximum punishments were discussed and it was reiterated that decisions about whether to prosecute were in the discretion of Appellant's chain of command and their legal staff. The military judge found that Appellant did not perceive the agent's statement as an offer of immunity and that the statement did not entice Appellant to provide "his modified version of events."

The military judge also took issue with the "moment when the agents insinuated that [Appellant's] release was contingent on admitting to something which the agents could identify as being the truth." The military judge found this to be an improper tactic but not an unlawful inducement as the release was not conditioned upon a particular version of events and as the release to his first sergeant reflected "the normal processing of the investigation." Notwithstanding his concerns, the military judge reasoned that the interrogation techniques used in the interview of Appellant did not overcome his will to resist.

None of the military judge's findings of fact are clearly erroneous and instead are fully supported by the record. Further, based on our review of the totality of the circumstances, we agree with his conclusion that Appellant's statements were voluntary, his will was not overborne, and his capacity for self-determination was not critically impaired.

**B. Equivocal Fifth Amendment Request for Counsel.**

Appellant asserts that he requested counsel prior to abandoning the "zombie" story and admitting that he had placed PO2 DC in a chokehold. Interrogation of a suspect in custody must cease if the suspect requests counsel unless counsel is present for the interrogation. Mil. R. Evid. 305(c)(4). Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). Statements subsequent to a clear invocation of counsel may not be considered in determining whether the invocation was ambiguous. *Id*. Reviewing courts may, however, consider statements and events im-

mediately preceding the invocation, as well as "nuances inherent in the request itself." *Id.* at 100; *United States v. Delarosa*, 67 M.J. 318, 324 (C.A.A.F. 2009).

An ambiguous comment or request, however, does not require that interrogation cease. A request for counsel must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). If the mention of an attorney "fails to meet the requisite level of clarity," questioning may continue. *Id.* "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461–62. The determination of whether an invocation is unambiguous (requiring the agents to immediately terminate the questioning) or ambiguous (permitting further clarifying questions) is an objective inquiry based upon how a "reasonable police officer" would view the comments. Although not raised at trial, the military judge in his ruling on the suppression motion found Appellant's statement about counsel to be an ambiguous request. We agree.

During the interview the agents repeatedly pressed Appellant for details about the cut on the ear. Appellant, however, continued to deny or claim a lack of recall as to any specific knowledge. After a series of questions along this line, the following exchange took place:

> Appellant: And just everything is screaming at me that I – I need to like stop and ask for a lawyer.
>
> SA DH: You will be perfectly fine.
>
> Appellant: Or that this is all just me admitting guilt and something.
>
> SA DH: You are only -- I'm trying to think how to say this -- you are not admitting guilt unless it actually happened.
>
> SA JT: Look, man, you know, there's of course, you know, he explained your rights to you. You know you can ask for a lawyer any time. We can't, you know, we're not lawyers. We can't advise you on that.
>
> SA DH: It's up to you.

The evidence establishes by a preponderance of the evidence that Appellant made a knowing and intelligent waiver of his right to counsel and his right to remain silent at the initiation of the interview. When asked whether he wanted a lawyer, Appellant replied "not right now." For the first time on appeal, Appellant claims that his later statement "And just everything is screaming at me that I – I need to like stop and ask for a lawyer" was an un-

ambiguous request for counsel that was not honored by the agents. We disagree.

Appellant's statement is more accurately characterized as thinking out loud about whether or not he should ask for a lawyer. This was an ambiguous comment by Appellant that reflected his internal thought process as he weighed his choices at that time. This was not an unambiguous or unequivocal request for counsel. The agents were not required to stop the interview or seek a clarification.

We do, however, find it concerning that one of the agents immediately responded even before Appellant could complete his thought, telling Appellant "you will be perfectly fine"—the implication being that Appellant did not need an attorney. The Supreme Court has recognized that "it will often be good police practice for interviewing officers to clarify whether or not [a suspect] actually wants an attorney." *Davis*, 512 U.S. at 461. But this statement, rather than seeking clarification, instead implied that Appellant did not need counsel. This impulsive statement by the agent can hardly be condoned. But apparently aware of his partner's statement and its potential to undermine Appellant's waiver of counsel, the other agent only moments later told Appellant that he could ask for a lawyer at any time but that the agents could not advise him about whether he should or should not do so. Following his partner's lead, the other agent then informed Appellant that it was up to him whether to request counsel.

In sum, while Appellant could have concluded that the agents did not want him to request counsel, the agents had clearly informed Appellant of his rights and he understood that he could make a request for counsel at any time. Appellant did not immediately respond to the agents. The agents then continued their questioning of him. Appellant did not make any further statements about counsel during the course of the remaining interview. Having considered the totality of the circumstances from the view of a reasonable police officer, the statement was ambiguous. We find that Appellant did not make an unambiguous or unequivocal request for counsel and we remain convinced by a preponderance of the evidence that Appellant made a knowing and intelligent waiver of his right to counsel that continued for the duration of the interview.

## C. Sixth Amendment Right to Presence of Counsel.

Appellant argues that notwithstanding affirmatively declining his right to counsel after rights advisement, the AFOSI agents violated both his Sixth Amendment right to counsel and his right to counsel's presence for post-preferral interrogation pursuant to Mil. R. Evid. 305(c)(3) when they interviewed him outside of the presence of his appointed German counsel. Essen-

tially, Appellant argues that his waiver of counsel should be presumed invalid because he had a German attorney and an adverse judicial proceeding in the German court system had begun triggering both his Sixth Amendment and Mil. R. Evid. 305 right to presence of counsel for the AFOSI interrogation. We disagree and conclude that his waiver of counsel was made freely, knowingly, and intelligently.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The Supreme Court has interpreted this to mean "that the right to counsel does not attach until the initiation of adversary judicial proceedings . . . ." *United States v. Gouveia,* 467 U.S. 180, 188 (1984). Adversary judicial proceedings commence for an accused "at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972)).

In the military, preferral of charges initiates adversary judicial proceedings and causes the Sixth Amendment right to counsel to attach. *United States v. Wattenbarger,* 21 M.J. 41, 43 (C.M.A. 1985). Mil. R. Evid. 305(c)(3) provides that:

> if an accused against whom charges have been preferred is interrogated on the matters concerning the preferred charges . . . and the accused requests counsel, or if the accused has appointed or retained counsel, any statement made in the interrogation . . . is inadmissible unless counsel was present for the interrogation.

The initial inquiry is to determine whether or not adversary judicial proceedings had begun for the purposes the Sixth Amendment or Mil. R. Evid. 305(c)(3). After being stopped in the early morning hours of 14 December 2013, Appellant was arrested by German authorities and taken to a German confinement facility where he remained in their custody until 16 December 2013. Appellant was eventually questioned by German police. After being advised that he had the right to consult with an attorney, Appellant voluntarily waived that right and provided a statement to the German authorities. While still in the custody of the German authorities and in pretrial confinement, Appellant appeared at a preliminary hearing. As part of this process, Appellant was appointed a German attorney. The record lacks detail as to what matters were addressed at the hearing or what if anything Appellant said or did. What can be determined is that the hearing took place during the three days that Appellant was in a German jail and therefore would have occurred on or before 16 December 2013, the day Appellant was released to U.S. mili-

tary authorities. The military judge in his findings of fact on the suppression motion found that "at the hearing, the accused was informed that he was being held on a charge of homicide and that he would be going to prison for an undetermined length of time."

Based on the celerity with which the hearing occurred, the fact Appellant was in a German jail at the time, and that he was informed that he was being *held* on a charge of homicide, it is likely the hearing would have at least addressed the propriety of his continued pretrial confinement but there is nothing in the record to strongly suggest that any other procedural step such as a probable cause-type hearing or arraignment occurred. Likewise, there is nothing in the record to establish that Appellant had been formally charged within the German criminal judicial system by means of a written legal instrument; the functional equivalent of an information, indictment or preferral.

Following his release from the German confinement facility, Appellant was allowed to go home and he performed his normal duties on 17 and 18 December 2013. On 19 December 2013, Appellant was interviewed by the AFOSI. The AFOSI agents had prepared for the interview by reviewing information gathered by the German investigators and were aware of Appellant's claim as to how he had found PO2 DC on a street in Kaiserslautern in a "zombie-like" state carrying a bathmat and towels. The agents were also aware that Appellant had been appointed a German counsel. The agents did not notify the German counsel of their plan to question Appellant on 19 December 2013. Prior to being questioned about the death of the decedent, Appellant was advised of his right to counsel by the AFOSI agents and acknowledged that he understood his rights. When asked if he wanted a lawyer, he responded "not right now." He was then asked whether he was willing to answer questions to which he answered "yes." At no time while in the custody of the German or United States authorities did Appellant express an unwillingness to be questioned.

As discussed above, the record does not establish with precision whether Appellant had been formally charged with an offense by the German authorities or whether the preliminary hearing addressed matters other than review of pretrial confinement. Putting aside for the moment the question of whether the Sixth Amendment right to counsel attaches at the initiation of a foreign judicial proceeding, we are not persuaded that sufficient adverse judicial proceedings had commenced as of 19 December 2013 such that the Sixth Amendment right to counsel attached. Further, even if the analogous actions taken by the German authorities as of 19 December 2013 would have triggered a Sixth Amendment right to counsel in a United States jurisdiction, we are not convinced that foreign judicial proceedings would ever be a trigger for

the Sixth Amendment right to counsel. "Generally the actions and knowledge of officials of a foreign nation are not imputed to American authorities in connection with application of American constitutional guarantees." *United States v. Vidal,* 23 M.J. 319, 323 (C.M.A. 1987).

In any event, the Supreme Court's holding in *Montejo v. Louisiana*, 556 U.S. 778 (2009), stands for the proposition that an investigator is free to question a suspect even after the initiation of criminal proceedings and after the suspect has consulted with an attorney, as long as the suspect voluntarily waives his or her right to the presence of counsel. As the Court expressed:

> [W]hen a defendant is read his Miranda rights (which includes the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment. As a general matter an accused who is admonished with the warnings prescribed by the U.S. Supreme Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

*Id.* at 786–87 (internal quotation marks, elisions, and citations omitted).

So even if Appellant's Sixth Amendment right to counsel had attached as of 19 December 2013, the agents were not required to contact Appellant's German-appointed attorney before they interviewed him and were not otherwise precluded from initiating questioning.

Distinct from his Sixth Amendment right to counsel, Appellant also argues that because he was represented by his German counsel for the murder of PO2 DC, Mil. R. Evid. 305 required that his statements taken outside the presence of counsel be suppressed.

By its terms, the right to the presence of counsel at interrogation under Mil. R. Evid. 305(c)(3) only applies to interrogation conducted subsequent to preferral of charges. Turning to the case at hand, the charges were not preferred until 10 March 2014, well after the AFOSI interrogation of Appellant on 19 December 2013. Thus, as of that date, the presence of the German counsel was not required by Mil. R. Evid. 305 before the interrogation of Appellant regarding the death of PO2 DC.

In summary, neither the Sixth Amendment nor Mil. R. Evid. 305 required notice to the German attorney nor his presence in order for the AFOSI special agents to question Appellant. All that was required was a rights advisement and valid waiver of those rights by Appellant prior to the interrogation. That is precisely what occurred.

**D. Multiplicity and Unreasonable Multiplication of Charges.**

Appellant next avers that Specifications 1 and 2 of Charge I for false official statements are multiplicious and an unreasonable multiplication of charges because they arose out of the same continuous interrogation. At trial, the military judge denied a Defense motion to dismiss on these bases as well as a later motion to merge the specifications for sentencing purposes.

We review whether two offenses are multiplicious de novo. *United States v. Hudson*, 59 M.J. 357, 359 (C.A.A.F. 2004). The test to determine whether an offense is factually the same as another offense is the "elements" test. *Hudson*, 59 M.J. at 359 (citing *United States v. Foster*, 40 M.J. 140, 142 (C.M.A. 1994)). "Under this test, the court considers 'whether each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "To determine whether the offenses are factually the same, we review the 'factual conduct alleged in each specification.'" *Id.* (citations omitted).

Here, each specification alleges distinct and different falsehoods. Specification 2 alleges six false statements that Appellant made orally as he generally described how the decedent departed SSgt TS's apartment under his own power, how Appellant found the decedent wandering the streets of Kaiserslautern, and the decedent's condition when Appellant found him. At some point during the interrogation, after being confronted with the inherent improbability and incredible nature of the "zombie" narrative, Appellant admitted to fabricating that story and went on to describe confrontations that occurred at the apartment. The confrontations at the apartment provide the context for the five subsequent false statements written on an official document signed by Appellant and alleged in Specification 1. As each specification required proof of different facts, we hold they are not multiplicious.

We review a military judge's decision to deny relief for unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012); *United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004). "[E]ven if offenses are not multiplicious as a matter of law with respect to double jeopardy concerns, the prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard—reasonableness—to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system." *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). Even when specifications are not an unreasonable multiplication of charges for findings, they may be for sentencing. *Campbell*, 71 M.J. at 23.

The following non-exclusive factors guide our determination of whether there has been an unreasonable multiplication of charges: (1) whether an objection for unreasonable multiplication of charges was made at trial; (2) whether the specifications are aimed at distinct criminal acts; (3) whether the number of charges and specifications misrepresent or exaggerate the charged criminality; (4) whether the number of charges and specifications unreasonably increase the punitive exposure; and (5) whether the evidence shows prosecutorial overreaching or abuse in drafting the charges. *Pauling*, 60 M.J. at 95 (citing *Quiroz*, 55 M.J. at 338).

Here, we find no unreasonable multiplication of charges for findings or sentencing purposes. While the trial defense counsel did object to the charging at trial, the remaining factors weigh against Appellant. Specifically, we note that: (1) although arising under the same interrogation, the specifications of Charge I are aimed at distinctly different criminal acts—distinct and different false official statements that correspond to differing versions of events given by Appellant in a homicide investigation; (2) the number of charges and specifications do not misrepresent or exaggerate Appellant's criminality—as noted, Specification 1 reflects Appellant's second false version of events that he put in writing after being challenged on his fabricated "zombie" narrative; (3) the number of charges and specifications do not unreasonably increase Appellant's punitive exposure—indeed, in this murder trial, it had no impact on the maximum punishment; and (4) there is no evidence of prosecutorial overreaching—to the contrary, the two specifications complained of alleged eleven distinct false statements. In short, the military judge did not abuse his discretion by finding no unreasonable multiplication of charges for findings or sentencing purposes.

## E. Findings Instructions.

Appellant asserts the military judge committed reversible error by declining to provide two sets of requested findings instructions: tailored accomplice and immunized testimony instructions that included the word "leniency"; and an instruction on the defense of accident. We disagree.

We review a military judge's decision to provide a non-mandatory instruction for an abuse of discretion. *United States v. Barnett*, 71 M.J. 248, 249 (C.A.A.F. 2012). We review the propriety of the instructions given by a military judge de novo. *United States v. Quintanilla*, 56 M.J. 37, 83 (C.A.A.F. 2001). A "military judge has an independent duty to determine and deliver appropriate instructions." *Barnett*, 71 M.J. at 249 (quoting *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008)). While counsel may request specific, "non-mandatory" instructions from the military judge, the judge has substantial discretionary power in deciding on the instructions to give. *Id*. Applying an abuse of discretion standard, the test to determine if a military judge's de-

cision not to give a requested instruction constitutes reversible error is whether the requested instruction: (1) is correct; (2) is not substantially covered in the main instructions; and (3) is on such a vital point in the case that the failure to give it deprived the accused of a defense or seriously impaired its effective presentation. *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993).

### 1. Accomplice and Immunized Testimony Instructions.

The United States Court of Appeals for the Armed Forces set forth the necessary elements of an accomplice testimony instruction in *United States v. Gillette*, 35 M.J. 468, 470 (C.M.A. 1992):

> [W]henever the evidence raises a reasonable inference that a witness may have been an accomplice or claims to have been an accomplice of the accused, and upon request of either the Government or defense, the military judge shall give the members a cautionary instruction regarding accomplice testimony. First, the members shall be instructed how to determine whether a witness is an accomplice. Second, they shall be given the standard instruction regarding the suspect credibility of accomplice testimony.

We have subsequently expressed that we "view the decision whether to give an accomplice instruction and its wording as discretionary" and that the form accomplice instruction contained in Department of the Army Pamphlet 27-9, Military Judges' Benchbook, Instruction 7-10, is not "imbue[d] with talismanic qualities." *United States v. Bigelow*, 55 M.J. 531, 534 (A.F. Ct. Crim. App. 2001), *aff'd*, 57 M.J. 64 (C.A.A.F. 2002). Rather than parsing an instruction given by a military judge for its fidelity to a particular form or model instruction, we evaluate whether the fundamental principle that accomplice testimony should be viewed with caution and skepticism was clearly made known to the court members by the instructions taken as a whole.

Here, the military judge gave both the accomplice and immunized witness testimony instructions concerning the testimony of SPC CK. Appellant nonetheless asserts that "the military judge erred when he modified the standard Benchbook instructions to remove any reference to the significant leniency that SPC CK had obtained in exchange for his testimony." Appellant points to three instances where the military judge deviated from the Benchbook form instructions and omitted a specific mention of "leniency" or a "promise of leniency" as a motivation to falsify testimony. Instead of using the term "leniency," the military judge instructed the members that SPC CK testified under a grant of immunity as part of a pretrial agreement which affected the processing of his court-martial and specifically instructed the members that

"in determining the credibility of this witness [SPC CK], you should consider the fact that this witness testified under a grant of immunity." As it regards his pretrial agreement and the processing of his case, SPC CK testified that in exchange for his pleading guilty to a charge of false official statements, his cooperation with investigators and attorneys, and his testifying at trial, his testimony was immunized and charges for premeditated murder and obstruction of justice were dropped. SPC CK also testified that he was already out of jail raising an inference that, in addition to not facing prosecution for murder, there was a limitation of the period of confinement that could be imposed as punishment. We find the accomplice and immunized testimony instructions given in this case, taken as a whole, more than sufficiently addressed the issues presented by the evidence. The military judge crafted instructions that were correct and provided the members an appropriate framework to evaluate SPC CK's testimony.

This conclusion is buttressed by our superior court's decision in *United States v. Carruthers*, 64 M.J. 340 (C.A.A.F. 2007). There, the court reviewed whether the military judge—who substantially provided the standard Benchbook instruction regarding potential accomplices—nonetheless abused his discretion by declining to give a leniency instruction. Although the court observed that "it would have been better to give the Benchbook leniency instruction once the issue was raised," the court found that "the military judge did not err because the instruction he gave covered its 'critical principles.'" *Id.* at 346 (quoting *Bigelow*, 57 M.J. at 67-68). As the instructions given in this case also covered the critical principles of the accomplice and leniency instruction, we too find that the military judge did not abuse his discretion and that the instructions taken as a whole were legally sufficient.

### 2. Defense of Accident Instruction.

Pursuant to Rule for Courts-Martial (R.C.M.) 916(f), "[a] death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable." If the special defense of accident is reasonably raised by the evidence, the military judge has an affirmative duty to instruct the members on the defense. *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000). The defense of accident has three parts. First, the accused's acts resulting in the death must have been lawful. Second, the accused must not have been negligent. In other words, the accused must have been acting with the amount of care for the safety of others that a reasonably prudent person would have used under the same or similar circumstances. Third, the death must have been unforeseeable and unintentional. *United States v. Rodriguez*, 31 M.J. 150, 157 (C.M.A. 1990).

A military judge must instruct the members concerning the defense if the record contains "some evidence on each of these elements." *United States v.*

*Jenkins*, 59 M.J. 893, 898 (Army Ct. Crim. App. 2004) (quoting *United States v. Ferguson*, 15 M.J. 12, 17 (C.M.A. 1983)). A defense is reasonably raised when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (internal quotation marks and citations omitted); *United States v. Watford*, 32 M.J. 176, 178 (C.M.A. 1991) (noting a defense is reasonably raised when there is "some evidence" to which the panel members "might attach credence"). The accused's statements, without any additional evidence, may be sufficient to require an instruction on a special defense. *Ferguson*, 15 M.J. at 17 (citing *United States v. Tucker*, 38 C.M.R. 349, 352 (C.M.A. 1968)); see *United States v. Moore*, 36 C.M.R. 531, 534-35 (C.M.A. 1966). Any doubt regarding whether an affirmative defense instruction is in order should be resolved in favor of the accused. *Davis*, 53 M.J. at 205.

The adequacy of a military judge's instructions is reviewed de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). "The military judge bears the primary responsibility for ensuring that mandatory instructions . . . are given and given accurately." *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003); *see also* R.C.M. 920(a).

"Where an instructional error raises constitutional implications, this Court has traditionally tested the error for prejudice using a 'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). The test for determining if the constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "Whether the error is harmless beyond a reasonable doubt is a question of law that we review de novo." *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004).

Appellant testified in his own defense that he put his hands on PO2 DC's neck and applied pressure but denied that he had planned to kill PO2 DC. He claimed he only intended "to knock him out." Appellant stated that prior to this interaction, SPC CK hit PO2 DC in the head with a whiskey bottle, rendering PO2 DC unconscious. According to Appellant, he moved PO2 DC from the kitchen to the bathroom and then decided to wake PO2 DC and take him home in order to avoid further confrontation. PO2 DC "seemed fuzzy at first" but then became upset. Specifically, Appellant testified that PO2 DC threatened to rape his wife, who was now Appellant's paramour, and speculated that such an act might cause her to commit suicide. As to how the physical

altercation transpired between Appellant and PO2 DC, Appellant testified as follows:

> He wasn't just saying those things. He was slapping me in the head, and I was trying to get him to stop. I was telling him to -- to -- to -- to -- to "Shut up and stop, please. Just calm down." And I'd -- I'd -- I started -- I -- I pushed him into the corner. And then he started laughing. And that upset me even more. And so I -- I grabbed the front of his sweater and backed up. Quickly backed up with him, and then drove forward and drove us both to the ground. He was -- he wasn't hitting me hitting me when we were standing up, but at this point, now, he's actually increased the force that he's hitting me with. I'm lying on top of him. We're squirming on the floor. I have my head against his chest, and I -- I want the whole situation to -- to stop. I want -- I have -- I -- it was completely out of my control. I just wanted it to stop. And so the only way that I knew to do that was to try to choke him out, to not choke him choke him out, but to get him to stop by knocking him out. I -- I tried to get ahold onto the side of his neck with my hands, but he was fighting back and it took -- it took it a -- awhile for me to actually get to a point where I had a hold where I could -- could apply the pressure that I needed to knock him out. Like I would get ahold with my left hand and then he would start pulling that away and then I moved my right hand up and he pulled that away, then he was hitting me, and it was -- it was just -- it was a lot of effort to -- to actually do it.

Appellant testified during cross-examination that as soon as PO2 DC became unconscious, he let go of his neck. Appellant stated that he had taken combatives training as part of unit physical training and had been instructed on various holds or maneuvers that would render a person unconscious by restricting blood flow to the head. Appellant testified later on redirect that he only intended to incapacitate PO2 DC, not kill him.

During the discussion on findings instructions the defense counsel specifically requested that the defense of accident instruction be given. When asked by the military judge to identify the lawful act required for the defense of accident, the defense counsel replied that Appellant was lawfully attempting to de-escalate the situation by rendering PO2 DC unconscious, that Appellant had reverted back to his training, and, implicitly, that death was neither intended nor expected. The military judge stated that he was not persuaded that there was any evidence in front him "that the accused was acting in a lawful manner exercising lawful means, set aside the issue of self-defense"

and that "even if it was appropriate, it [accident instruction] seemed contained within either the elements of the offenses or within the self-defense instruction." The military judge instructed the members on self-defense in that there was evidence which indicates the death may have occurred as an unintended result of the accused's lawful use of force in defense of himself. The military judge provided the following elements for self-defense:

> Self-defense is a complete defense to the death of PO2 DC if: first, the accused had a reasonable belief that bodily harm was about to be inflicted on himself; second, the accused actually believed that the force he used was necessary to protect himself; third, deadly force was not used by the accused; fourth, the death of PO2 DC was not intended by the accused; and fifth, the death of PO2 DC was not a reasonably foreseeable result of the accused's act.

Appellant's testimony did provide some evidence as to each of the elements of an accident defense and for self-defense. First, Appellant testified that after he revived PO2 DC, that PO2 DC began making threats to rape Appellant's paramour and that PO2 DC was slapping Appellant in the head. The testimony at face value was that PO2 DC was inflicting bodily harm on Appellant prior to the use of force by Appellant. Appellant told PO2 DC to "shut up and stop" but this did not result in PO2 DC stopping. Appellant then pushed PO2 DC into the corner and subsequently took PO2 DC to the ground. While on the ground, PO2 DC was hitting Appellant as Appellant lay on top of him. It is at this point that Appellant decided to "choke" and render PO2 DC unconscious in order to get him to stop. Whether the resulting death by manual strangulation could constitute an accident is dependent on whether or not self-defense could apply. If self-defense applies, then the acts of Appellant were lawful and done in a lawful matter. Based on the testimony of Appellant, the only legal justification for the use of force would be self-defense. Further, Appellant testified that he only intended to render PO2 DC unconscious, not to kill him. Therefore, there was evidence that the death was unintentional. Finally, Appellant testified that he let go of the neck once PO2 DC was unconscious and that this was consistent with his combatives training.

We thus find that a defense of accident was raised but only in the context of a claim of self-defense. The self-defense instruction given was specifically tailored to the evidence indicating that the death of PO2 DC may have occurred as an unintended result of Appellant's lawful use of force and therefore the essential elements of an accident defense were provided to the factfinder. In light of the tailored self-defense instruction, we conclude that a separate, stand-alone accident instruction was not required. The instruction

provided by the military judge was sufficient. Assuming arguendo that a separate accident instruction was required, we nonetheless find that absence of such an instruction was harmless beyond a reasonable doubt. The self-defense instruction given permitted Appellant to argue that his application of force to PO2 DC was lawful and the resultant death was unintentional and unexpected as a complete defense to the charge and specification of premeditated murder and its lesser included offenses. Appellant was not denied a meaningful opportunity to mount this defense. As such, we are convinced beyond a reasonable doubt that the absence of a separate accident instruction did not contribute to the verdict.

**F. Prosecutor's Closing Argument.**

Appellant asserts trial counsel engaged in prosecutorial misconduct during his closing argument by referring to Appellant as a liar, characterizing aspects of Appellant's trial testimony as "ridiculous" and "beyond silly," maligning defense counsel, and vouching for the credibility of government witnesses.

Improper argument is a question of law that is reviewed de novo. *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011). Because there was no objection at trial, we review the propriety of trial counsel's argument for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013). To prevail under a plain error analysis, Appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (quoting *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)).

Appellant alleges trial counsel impermissibly attacked him during argument by referring to Appellant as a "practiced liar" and by his persistent theme of how Appellant tweaked his story when confronted with new facts. As part of his argument, trial counsel identified multiple statements by Appellant to law enforcement during the investigation, as well as portions of his trial testimony, and labeled them as lies. Appellant relies on our superior court's frequent admonition repeated in *United States v. Fletcher*, 62 M.J. 175 (2005), "that calling the accused a liar is a dangerous practice that should be avoided." *Id.* at 182 (internal quotation marks and citation omitted).

While the trial counsel did refer to Appellant as a "practiced liar" and identified his "lies," the comments by trial counsel have to be assessed in the context of the trial as a whole with particular attention paid to whether the language used reflected more of an appropriate commentary on the evidence and credibility of Appellant rather than improper personal attacks on Appellant. In this regard, we note that Appellant was charged with making false official statements to AFOSI and with obstruction of justice for making false

statements to German law enforcement authorities. Those charges are representative of Appellant's statements regarding PO2 DC's death that the trial counsel characterized as being "tweaked" by Appellant to conform to new evidence. This was a proper commentary on the evidence and specifically on the credibility of Appellant who testified, given the prior inconsistent statements by Appellant and the evidence of specific instances of his untruthfulness. Appellant himself admitted during his trial testimony that he had lied to both the German and AFOSI investigators when he provided his "zombie-walk" story of how he found PO2 DC.

We also note that the military judge instructed the members regarding false exculpatory statements and the permissive inference of consciousness of guilt when a voluntary explanation or statement is shown to be false. Evidence of false exculpatory statements made by Appellant in this case were hardly in dispute and ever-evolving. Further, it is against this backdrop that the trial counsel characterized claims made by Appellant during his testimony in court as "ridiculous" and "beyond silly." In each instance, trial counsel made logical appeals to the members as to why those claims were nonsensical. With the exception of twice characterizing Appellant as a "practiced liar" and once as "one that cannot be trusted with the truth" statements that we will analyze more fully below, each of the arguments directly regarded a statement made by Appellant and were well within the bounds of proper commentary.

Regarding trial counsel's statement that Appellant was a "practiced liar" and not to be "trusted with the truth," we cannot discern whether these comments solely regarded statements surrounding the death of PO2 DC or were a more general indictment and personal attack on Appellant. It is well established that while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *United States v. Frey*, 73 M.J. 246, 248 (C.A.A.F. 2014) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935).). Assuming arguendo that these comments were an improper personal attack, we do not find these comments were so obviously improper as to merit relief in the absence of an objection from counsel. Thus, while trial counsel's word choices in this regard were perhaps ill-advised given our superior court's admonition, they do not rise to the level of plain error.

Appellant also claims that trial counsel maligned his trial defense counsel during rebuttal argument. Disparaging or derogatory remarks about opposing counsel tend to not only detract from the dignity of judicial proceedings but also risk turning a trial into a popularity contest instead of a case decided solely on the evidence presented. "Disparaging remarks about defense coun-

sel may cause the jury to believe that the defense's characterization of the evidence should not be trusted, and, therefore, that a finding of not guilty would be in conflict with the true facts of the case." *Fletcher*, 62 M.J. at 181 (internal quotation marks and citation omitted).

The trial defense counsel, in his closing argument, used the words "elaborate plan" seven times when attacking the government's proof on the element of premeditated design to kill and characterized the government as "desperate" in that effort: "And, Members, you have to ask yourself why this desperate grasping at straws. Why is the government telling you out of one side of its mouth that they don't have proof of an elaborate plan and out of the other trying to do it?" The trial defense counsel summarized this part of his argument by asserting "[t]here was no plan, Members. There was no premeditation. There was no intent."

Trial counsel responded during his rebuttal argument with the following:

> [T]here is a rhetorical device. It's called the straw man argument and that's what the defense counsel talked about for about two hours today. What defense counsel did, and I didn't keep track of the numbers, is say over and over again that the government wants you to believe there was an elaborate plan to kill [PO2 DC] that night. We made it clear originally, we have never asserted at any point in this trial that there was an elaborate plan to kill PO2 DC that night. You can put a straw man up there and knock it out. But if we hadn't made that argument, that's a waste of your two hours this afternoon.

Having reviewed the closing arguments of both sides, and with the benefit of the members' finding of not guilty on the offense of premediated murder, we can state with confidence that the defense counsel was effective in equating the lack of a plan with insufficient proof of a premeditated design to kill. Trial counsel was certainly within the bounds of proper rebuttal argument to respond to the "elaborate plan" line of attack and point out what he believed to be a logical fallacy with that argument. We do, however, find fault with trial counsel characterizing the defense counsel's argument as a "waste" of the members' time.

Finally, Appellant asserts that the trial counsel engaged in impermissible vouching regarding the trial testimony of SPC CK and SSgt SP. SPC CK was called as witness for the Government and testified that he had seen Appellant straddle PO2 DC and that Appellant admitted to him that PO2 DC was dead at the hands of Appellant. SPC CK's credibility was at issue, however, as he had previously been charged with making false official statements in

connection with the investigation into the death of PO2 DC and had been granted testimonial immunity by the time of Appellant's trial.

Against this backdrop, the trial counsel addressed the testimony of SPC CK in his closing argument as follows:

> And let's start with [SPC CK]. And for the record, that's a deep sigh from the trial counsel. [SPC CK], you can't say anything other than he's a lying liar who lies. I mean, he's repeatedly lied in this case. Every time he's been confronted with this opportunity to say what happened, he hadn't completely admitted to what happened. . . . And you may imagine in a murder case, when a prosecutor calls essentially the best friend of the accused and asked him the question, understanding that he understands that he could say whatever he wants at the point when we asked him the question, "Did you kill PO2 DC?" The prosecutor's heart may skip a beat for a moment, but my heart is still going, because he told you the truth about that.

Appellant also alleges that the trial counsel improperly vouched for SSgt SP when he asserted that "we don't have any video of what happened in the apartment that night, that would be great, but we don't have it. But we really have the next closest thing in [SSgt SP]."

Improper vouching occurs when the trial counsel places the prestige of the Government behind a witness through personal assurances of the witness's veracity. *Fletcher*, 62 M.J. at 180. Having considered the comment that SSgt SP was the next closest thing to a video of what happened in the apartment in the context of trial counsel's argument, we do not find it to be an instance of improper vouching. Trial counsel was highlighting the lack of evidence of any animus by SSgt SP toward Appellant or any interest that SSgt SP had in the outcome of the case. As he highlighted the evidence of SSgt SP's lack of bias for or against Appellant, he analogized the testimony to the objective recording that a video would have provided. This was a proper argument by analogy designed to orient the members to evidence to consider in weighing the credibility of SSgt SP.

In contrast, trial counsel did directly assert that SPC CK told the truth when he denied killing PO2 DC and couched it in terms of the anxiety and relief he experienced before and after the answer. While we do not doubt the drama of the moment, this was an improper personal assurance made by the trial counsel about the truthfulness of SPC CK on a critical matter and, therefore, an obvious error.

To summarize, we find error in trial counsel's characterization of the defense closing argument as a waste of the members' time and for the improper

vouching of SPC CK's responses as truthful. In assessing prejudice, we evaluate the cumulative impact of any prosecutorial misconduct on Appellant's substantial rights and the fairness and integrity of his trial. We do so by balancing three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction. *Fletcher*, 62 M.J. at 184.

In assessing the severity of the misconduct, we note that these two instances are but a small part of an approximately 57-page findings argument in the context of a members' trial that lasted three weeks with 29 witnesses called and 53 exhibits admitted into evidence during findings. We further note that the characterization of the Defense closing argument as a waste of time occurred during rebuttal and was in response to the Defense argument characterizing the Government as "desperate" to prove premeditation and speaking out of both sides of their mouth as to the existence of an "elaborate plan." There is an undeniable strain of ad hominem attack in this part of the Defense argument as well. We do not condone any of these types of comments, but this context is important in assessing the severity of the trial counsel's comment and its impact. We do not find the comments to be pervasive or severe. In assessing curative efforts by the military judge, we note that that Defense did not object to the comments at trial.

As far as the trial counsel personally vouching for the credibility of SPC CK, we note that it was limited to one occasion and that the military judge provided tailored accomplice and immunized testimony instructions for the testimony of SPC CK in addition to the standard credibility instructions applicable to all witnesses. Finally, the improper comments by trial counsel have no logical relationship to the strength of the Government's evidence supporting the findings of guilty which consisted of the physical evidence, forensic test results, expert testimony, and Appellant's own pretrial statements and trial testimony linking him, not SPC CK, to the killing. After balancing these three factors, we are confident that the improper comments by trial counsel had no impact and that the members convicted Appellant on the basis of the evidence alone.

## G. Substantially Verbatim Transcript of Discussion on Findings Instructions.

During transcription, it was discovered that there were 7 minutes and 33 seconds of missing audio from an Article 39(a) session concerning the discussion about findings instructions. The court reporter's primary equipment, as well as her backup, had a malfunction during this portion of the trial. As a result, the audio relating to the omitted portion of the transcript cannot be recovered. Appellant argues that this was a substantial omission requiring a new trial. We disagree.

Whether a transcript is verbatim, and a record of trial complete, are questions of law reviewed de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014). Article 54(a), UCMJ, 10 U.S.C. § 854(a), provides that "each general court-martial shall keep a separate record of the proceedings in each case brought before it, and the record shall be authenticated by the signature of the military judge." Our superior court has long interpreted Article 54(a), UCMJ, to require a transcript of general court-martial proceedings that is "substantially verbatim." *United States v. Lashley*, 14 M.J. 7, 8 (C.M.A. 1982) (quoting *United States v. Gray*, 7 M.J. 296, 297 (C.M.A. 1979)).

In assessing either whether a record is complete or whether a transcript is verbatim, the threshold question is "whether the omitted material was 'substantial,' either qualitatively or quantitatively." *Id.* at 9. *Cf. United States v. Gaskins*, 72 M.J. 225, 229 (C.A.A.F. 2013) (stating that a "substantial" omission makes a record incomplete). The transcript in this case omitted seven minutes and 33 seconds from an Article 39(a) session where finding instructions were discussed and ruled upon. Thus, our focus is on the narrow threshold question whether the omission in the transcript was qualitatively or quantitatively substantial, which would render it nonverbatim.

A transcript may be deemed "substantially verbatim" even though it has certain omissions. *Davenport*, 73 M.J. at 377. In contrast, omissions are qualitatively substantial if the substance of the omitted material "related directly to the sufficiency of the Government's evidence on the merits," and "the testimony could not ordinarily have been recalled with any degree of fidelity." *Lashley*, 14 M.J. at 9. Omissions are quantitatively substantial unless "[t]he totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness." *United States v. Nelson*, 3 C.M.A. 482, 487 (C.M.A. 1953).

Just prior to the missing audio, the military judge provided a rationale for not granting a defense counsel's request that a mistake of fact instruction be given. In fact, the military judge had considered this request and denied it in an earlier session but offered the defense counsel "one more shot at it" to assist the military judge to "better understand which element that applies to and how it applies in this case." The defense counsel responded, "I don't have anything additional, Your Honor" as to why a mistake of fact instruction should be given. When the audio and transcript resumed, defense counsel was arguing against the Government's request for use of evidence of a prior assault under Mil. R. Evid. 404(b) to prove the premeditated murder. The military judge had previously considered a pretrial motion in limine on this issue and ruled that the trial counsel would not be permitted to make those arguments. The military judge again agreed with the defense counsel during this session and ended the discussion on this issue stating to the trial counsel that

"[y]our request for reconsideration – I have reconsidered, but I stand by my prior ruling, so we're not going to change on that."

A post-trial Article 39(a) session was convened to try to reconstruct the missing audio. The defense objected to the reconstruction effort, but participated in the proceeding. All the trial participants essentially agreed that the missing audio concerned the discussion regarding the mistake of fact instruction and the Government's request for reconsideration of the Mil. R. Evid. 404(b) evidence. The military judge held that despite the missing audio, the transcript was substantially verbatim. Appellant argues that as the missing "audio contained the discussion and ultimate denial of an instruction requested by the defense," the record is not verbatim.

Having reviewed the entire record, we find the omission insubstantial and therefore conclude that the transcript is substantially verbatim. The missing audio regards a discussion of findings instructions requested by counsel—specifically mistake of fact by the Defense and use of evidence under Mil. R. Evid. 404(b) by the Government. For both requests, the missing audio is best described as a reconsideration ruling by the military judge as he had already heard arguments on these matters and ruled. There is no mystery as to what the military judge decided and why or what findings instructions were given or not given. Therefore, the discussion of the mistake of fact instruction that may be missing from the record of trial is functionally just a restatement of the military judge's earlier analysis and decision. We agree with the military judge that the transcript is substantially verbatim and the record complete.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of Appellant occurred. Article 66(c), UCMJ. Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court